IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **GRINNELL MUTUAL REINSURANCE COMPANY,** <br><br> Plaintiff, <br><br> v. <br><br> **S.B.C. FLOOD WASTE SOLUTIONS, INC., f/k/a FLOOD WASTE SOLUTIONS, INC., BRIAN J. FLOOD, SHAWN FLOOD, CHRISTOPHER FLOOD, KAREN S. COLEY, and FLOOD BROS. DISPOSAL CO.,** <br><br> Defendants. | **Case No. 18 C 4922** <br><br> **Judge Harry D. Leinenweber** |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Grinnell Mutual Reinsurance Company ("Grinnell") seeks recission of its insurance contracts with Defendants S.B.C. Flood Waste Solutions, Inc., Brian J. Flood, Shawn Flood, Christopher Flood, and Karen S. Coley under § 154 of the Illinois Insurance Code on summary judgment. (Dkt. No. 116.) Grinnell also seeks to strike the affidavit of Andrew Cory. (Dkt. No. 159.) The Court grants the Motion for Summary Judgment and denies the Motion to Strike as moot.

**I.  BACKGROUND**

Grinnell filed this suit in response to a 2018 state court dispute where certain Flood family members alleged other Flood

family members unfairly used the name "Flood" in connection with waste or recycling services. The Court reviewed the details of the underlying state action in its prior memorandum opinion and order, *Grinnell Mutual Reinsurance Co. v. S.B.C. Flood Waste Solutions., Inc.*, No. 18 C 4922, 2020 WL 6940980 (N.D. Ill. Nov. 25, 2020), and does not go into further detail here. The facts relevant to the current summary judgment motion begin in late 2017 when the relationships within the Flood family business, Flood Brothers Disposal Co. & Recycling ("Flood Bros."), fully fractured. (*Id.* at *2.)

Prior to 2017, all relevant Flood family members were part owners or employees of Flood Bros., a waste management company. (Def.'s Resp. to Pl.'s Stmt. of Material Facts ("DSOF") ¶ 4, Dkt. No. 145.) In 2014, Defendant Chris Flood incorporated a separate entity called Flood, Inc., ostensibly to "pursue business that Flood Bros. had rejected or was not interested in pursuing" and in order to "maintain client relationships and provide a one-stop shop for all customers." (*Id.* ¶ 5.)

At an October 5, 2017, company meeting, family member Mike Flood took issue with Defendant Chris Flood's "using the Flood name" in his Flood, Inc. company. (*Id.* ¶¶ 9, 10.) In the meeting, Mike advocated firing Chris if he did not change the name of Flood, Inc. (*Id.* ¶ 9.) Brian Flood, Chris Flood's father and boss,

- 2 -

defended Chris and stated at the meeting, "Well, it's his name too. What's the big deal? He wasn't competing." (*Id.*) After the meeting, Brian sent his sons, Defendants Shawn and Chris Flood, the following email:

> Grampa had meeting today
> 1. Flood Inc he wants name changed or you don't work at flood anymore
>
> 2. He says we took flood equipment and put at a flood inc account and we bill flood inc ?
>
> So he is pissed about your business ..
> My suggestion is change name asap and tell everyone you no longer do .. to much anger I told you was bad idea at start ..
> Or sell the work
> You put me in a bad spot

(*Id.* ¶ 10.) Brian and Chris Flood subsequently received a letter dated October 23, 2017, from an attorney on behalf of Flood Bros., alleging the "[u]se of the name 'Flood, Inc.' interferes with the protected proprietary name of 'Flood Brothers Disposal Co. & Recycling" and demanded that they "cease and desist any commercial use of 'Flood, Inc." (*Id.* ¶ 13.) On December 18, 2017, Chris Flood's attorney responded to the Cease-and-Desist Letter "for settlement purposes." (*Id.* ¶ 14.)

At the same time the letter was sent, on October 23, 2017, Brian Flood was fired. (*Id.* ¶ 11.) Both Chris and Shawn Flood were terminated from Flood Bros. in December 2017. (*Id.* ¶ 15.) Shawn Flood's termination email also included a letter from the Vice

President of Flood Bros. and a Confidential Information and Non-Competition Agreement. (*Id.* ¶ 16.) The letter stated, in relevant part:

> Flood Bros Disposal Co. accounts have verified you are the contact for another firm, which interferes in proprietary rights of Flood Brothers account obligations.
>
> Based on the information Flood Bros Disposal Co. has gathered your employment at Flood Bros Disposal Co. is terminated.

(*Id.*) Defendants allege Shawn Flood did not understand what this language meant and that the Vice President refused to elaborate when asked. (*Id.*) The attached Confidential Information and Non-Competition Agreement, allegedly signed by Shawn Flood, is also a partially disputed fact. (*Id.*) Defendants allege the signature was forged. (*Id.*)

On the same day that Defendant Shawn Flood was fired, Defendant Karen Coley incorporated a new company called Flood Waste Solutions, Inc. (*Id.* ¶ 1.) On January 15, 2018, Karen Coley amended the articles of incorporation, and changed the name of the company to S.B.C. Flood Waste Solutions, Inc. ("SBC"). (*Id.* ¶ 2.) Ten days prior to this name change, Brian Flood consulted attorney Jennifer Doherty, who sent the following email:

> I am writing to follow up on our conversation. As we discussed, you are ready to proceed with the name SBC Flood Waste Solutions. Please remember, as we told you

- 4 -

> the other day, it is important that the letters "SBC" in your logo not be in a tiny font when compared to the word "Flood." In other words, it is important that the word Flood doesn't "jump" out at you, if that makes sense.

(*Id*. ¶ 17.)

Starting in December 2017, Defendants Shawn Flood and Christopher Flood began soliciting clients. (*Id*. ¶ 18.) Defendants do not deny that Defendants Shawn and Christopher Flood began to solicit "very few – less than 20" customers but argue that the solicitation was "in their individual capacities and not as employees of SBC, or through Christopher Flood as the owner of Flood, Inc." (*Id*.) For example, on December 20, 2017, Shawn Flood submitted a bid for a compacter service to a customer. (*Id*. ¶ 19.) When the customer had trouble reaching Shawn Flood, Shawn sent an explanatory email on January 17, 2018, stating that he was "starting a sister company" because "Flood Brothers in the process of a sale to another firm. The new company Flood waste solutions is the new sister company and about half of the company is already making the changes over." (*Id*.)

It is also an undisputed fact that Shawn and Christopher Flood used SBC form contracts to memorialize the service terms of these successful solicitations. (*Id*. ¶ 20.) These contracts were signed prior to receiving insurance coverage. (*Id*.) Defendants argue that "if the services were performed, they were not performed until

after SBC's insurance policy became effective on February 12, 2018." (*Id*.) Instead, Defendants "used Flood, Inc. to service those customers until mid-March 2018 because SBC was not operational yet." (*Id*. ¶ 22.) Flood, Inc., in turn, subcontracted the work out to other providers as SBC did not have any employees or equipment. (*Id*.) On February 5, 2018, and February 12, 2018, SBC hired two drivers for its operations. (*Id*. ¶ 31.)

On February 9, 2018, Plaintiff Grinnell received a Commercial Insurance Application form for commercial general liability (the "CGL Application") as well as a Commercial Insurance Application for a commercial automobile policy (the "Auto Application"). (*Id*. ¶ 29.) The issuance of the commercial automobile insurance was contingent on the issuance of the general commercial liability insurance. (*Id*. ¶ 33.) The CGL Application and Auto Application the below relevant representations.

CGL and Auto Applications:

- "LOSS HISTORY, CHECK IF NONE: [checked] ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS FOR THE LAST YEARS." No claims or occurrences disclosed.

- "DATE BUSINESS STARTED: 03/01/2018."

- PRIOR CARRIER INFORMATION: NEW VENTURE, NO PRIOR CARRIER."

- "DOES APPLICANT HAVE OTHER BUSINESS VENTURES FOR WHICH COVERAGE IS NOT REQUESTED? N."

Auto Application Only:

- "DRIVER INFORMATION, DATE HIRE: 03/01/2018."

  CGL Application Only:

- "DESCRIBE THE TYPE OF WORK SUBCONTRACTED: none."

- "CONTRACTORS, $ PAID TO SUBCONTRACTORS: 0."

- "CONTRACTORS, % OF WORK SUBCONTRACTED: 0."

- "4. DO YOUR SUBCONTRACTORS CARRY COVERAGES OR LIMITS LESS THAN YOURS? N."

- "5. ARE SUBCONTRACTORS ALLOWED TO WORK WITHOUT PROVIDING YOU WITH A CERTIFICATE OF INSURANCE? N."

(*Id.* ¶ 30.)

On May 10, 2018, Defendant Flood Bros., the original family company, filed a Complaint for injunctive relief and damages against Defendants SBC, Brian Flood, Shawn Flood, Christopher Flood, Karen Conley and Flood, Inc. in state court. (*Id.* ¶ 35.) SBC tendered notice of the claim to Grinnell on May 24, 2018. (*Id.* ¶ 37.) On June 13, 2018, Grinnell received an umbrella/excess section application form for umbrella liability insurance. (*Id.* ¶ 36.) The application contained following information:

> GIVE ALL DETAILS OF ALL LIABILITY CLAIMS EXCEEDING $10,000 OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS, DURING THE PAST FIVE (5) YEARS, WHETHER INSURED OR NOT, SPECIFY DATE, COVERAGE, DESCRIPTION, AMOUNT PAID, AMOUNT OUTSTANDING.

(*Id.* ¶ 37.) SBC neither marked "NO SUCH CLAIMS" nor described any claims on the form. (*Id.*) Although the policy was conditionally authorized, due to the May 24, 2018, state lawsuit, it was never issued. (*Id.* ¶¶ 39, 55.)

The Senior Underwriter at Grinnell, Kimberly Faas ("Faas"), was responsible for the decision to bind and issue the CGL Policy and Commercial Auto Policy (*Id.* ¶ 39.) In her affidavit, Faas states she would not have authorized the issuance of the CGL or Commercial Auto Policies had she received complete and truthful information in the applications. (*Id.* ¶ 40.) Specifically, Faas states that, had she known about the October company meeting, the Cease-and-Desist Letter, and the non-compete notice with the termination letter, as well as the fact that the company was engaging in a categorically high-risk activity (garbage collecting) and had been previously operating without insurance while subcontracting a large amount of work, she would not have issued the policy. (*Id.* ¶¶ 41–54.)

On July 19, 2018, Grinnell filed this Complaint alleging recission (Counts 1, 7, 10) or, in the alternative, declaratory judgment (Counts 2, 3, 4, 5, 6, 8, 9, 11). (Dkt. No. 1.) The parties agreed to bifurcate summary judgment, and on February 5, 2020, Grinnell filed a Motion for Partial Summary Judgment on the declaratory judgment counts. (Dkt. No. 54.) On November 25, 2020,

the Court denied the Motion. (Dkt. No. 89.) Grinnell now brings summary judgment on its recission claims. (Dkt. No. 116.) For the reasons set forth herein, the Court grants the Motion.

## II.  LEGAL STANDARD

The Court grants summary judgment when the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248.). The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015).

## III.  DISCUSSION

Under § 154 of the Illinois Insurance Code, insurers are permitted to deny coverage and rescind a policy if "(1) a statement in the policy application is false and (2) the false statement was either made with the intent to deceive the insurer or materially affects the acceptance of the risk assumed by the insurer." *Essex Ins. Co. v. Galilee Med. Ctr. S.C.*, 815 F.3d 319, 322 (7th Cir.

2016) (citing *Illinois State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino & Terpinas*, 27 N.E.3d 67, 71 (Ill. 2015)).

Grinnell points to three categories of statements, all of which Grinnell claims were misrepresentations and materially affected its assumption of the risk. First, when Grinnell asked to disclose "all claims or losses or occurrences that may give rise to claims," Defendants indicated they had nothing to disclose. (DSOF ¶ 30.) Second, Defendants verified throughout both the CGL and Auto Applications that SBC had not begun any business activity prior to March 1, 2018. Third, Defendants failed to disclose the existence of Flood, Inc. Because Defendants argue both that these were not false statements and that they were not material to the application, the Court addresses both prongs separately.

### A. False Statements under § 154 of the Illinois Insurance Code

The Court applies an objective standard when determining whether a false statement or misrepresentation occurred on the policy application. *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1057 (Ill. Appl. Ct. 1990). Defendants are required to disclose "any facts which, objectively considered, might have given rise to a claim, regardless of the applicant's subjective belief." *Id.* A "claim," in the insurance context, is to be considered "in its common (and common sense) usage." *Evanston Ins. Co. v. Sec. Assur. Co.*, 715 F.Supp. 1405, 1412 (N.D. Ill. 1989) In

- 10 -

other words, it is "an actual demand for something." *Cent. Illinois Pub. Serv. Co. v. Am. Empire Surplus Lines Ins. Co.*, 642 N.E.2d 723, 726 (Ill. App. Ct. 1994).

Grinnell points to four claims or occurrences which Defendants failed to disclose: (1) the October 5, 2017, meeting between Brian Flood and other senior Flood family members, (2) the follow-up October 23, 2017, Cease and Desist Letter, (3) the copy of the Non-Compete Agreement that Shawn received with his firing letter, and (4) the failure to report the actual underlying lawsuit on Defendants' application for umbrella insurance.

The parties agree the main takeaway from the October 5, 2017, meeting was that senior Flood family members wanted Flood, Inc.'s name changed, or Chris and Shawn Flood were at risk of being fired. Defendants argue, however, that none of the Defendants realized that it was because of competition concerns. Rather Defendants assert that the request was because other Flood family members didn't like the name of Flood, Inc. Defendants also argue that this was unrelated to any of its future ventures, and thus Defendants had no obligation to report this event.

All of Defendants arguments, however, center on Defendants subjective belief that Flood, Inc. does not compete with Flood Bros. Defendants do not advance any arguments on whether a reasonable person would consider this meeting an "occurrence that

may give rise to a claim." According to Brian Flood's testimony, he responded at the October 5, 2017, meeting by saying, "Well, it's his name too. What's the big deal? He wasn't competing." (DSOF ¶ 9.) Clearly the other Flood family members did not agree, as the meeting ended with a demand to stop using the name "Flood" in connection with waste and recycling services outside of the family company. Nevertheless, Defendants registered a new waste and recycling company that also included the name "Flood" the same day that Shawn Flood was fired.

Even if it was unclear from the October 5, 2017, meeting that the Flood family had demanded the cessation of using the name "Flood," the Flood family sent a follow up letter to clarify the family's position. On October 23, 2017, an attorney sent a Cease-and-Desist letter that set out Flood Bros.' legal claim to the word "Flood," and demanded Brian and Chris Flood to cease Flood, Inc.'s operations. This clearly states a claim or an occurrence that may give rise to a claim. *Frankenmuth Mut. Ins. Co. v. Hockey Cup, LLC*, No. 18 C 8142, 2019 WL 4573080, at *3 (N.D. Ill. Sept. 20, 2019) ("There is no question that receipt of a cease-and-desist letter can trigger an insured's duty to provide notice of a potential claim.").

Defendants' main argument throughout the briefing is that Flood, Inc. is a separate entity from the newly formed SBC.

However, the letter was addressed to both Brian and Chris Flood, who are officers of SBC and covered under Grinnell's CGL policy. This artificial distinction does not hold up as Flood, Inc. performed substantial services for SBC without any corporate formalities between SBC, Flood, Inc., or the work allegedly performed in Shawn or Chris Flood's individual capacities. The failure to report the legal demand to desist using the name "Flood" in connection with waste and recycling services was an objective misrepresentation by Defendants.

Grinnell's other claims of misrepresentation as to "claims and occurrences" have factual disputes which preclude the Court from reaching a determination. Specifically, Shawn Flood alleges that the non-compete agreement was forged, and the May 18, 2018, lawsuit was filed after the initial issuance of the CGL and Commercial Auto Policies. As a result, the Court refrains from reaching a conclusion as to whether these would constitute claims for the purposes of the CGL and Auto Applications.

The next category of falsehoods alleged by Grinnell relate to SBC's starting date. According to both applications, SBC did no business prior to March 1, 2018. However, Shawn and Chris Flood began submitting proposals and bids to customers starting in December 2017. SBC subsequently invoiced customers, hired drivers,

and subcontracted out waste and recycling work, all without insurance and prior to March 1, 2018.

In response, Defendants argue that this is "only partially true." (Resp. at 17, Dkt. No. 143.) Defendants argue that Shawn and Chris Flood used "SBC form contracts to memorialize the customer's requests, but it was Flood, Inc. who performed all services through its own subcontractors." (*Id.*) As a result, Defendants argue that the contracts were being entered "on behalf of themselves or Flood, Inc." (*Id.*) In response, Grinnell argues that Shawn and Chris Flood or Flood, Inc. were either subcontractors or SBC's alter ego.

Under Illinois law, "a corporate entity will be disregarded and the veil of limited liability pierced when two conditions are met." *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991) (citing *Van Dorn Co. v. Future Chemical and Oil Corp.,* 753 F.2d 565 (7th Cir. 1985)). First, there must be "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist." *Id*. Second, "circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Id.* In *Van Dorn*, the Court considered four factors commonly used in Illinois state courts: "(1) the failure to maintain adequate corporate records or to comply with

corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Van Dorn*, 753 F.2d at 570.

Defendants agree that there are no corporate records, contracts, or other formalities between SBC and Flood, Inc. For the second and third factors, the record is underdeveloped on the extent to which there is comingling of funds between SBC and Flood, Inc., or appropriate capitalization of the two companies. However, Defendants in their briefing note a time prior to February 12, 2018, when a Flood family member and part-owner of SBC dumped his waste at a waste facility and instructed the facility to bill SBC. (Resp. at 25, Dkt. No. 143.) This suggests that the funds between the Defendants and SBC were comingled. Defendants also state in their briefing that SBC "eventually took over some of the accounts serviced by Flood, Inc. after late February/early March 2018." (*Id.* at 20.) This fact demonstrates that SBC treated Flood, Inc. at the very least as a subcontractor, if not a temporary extension of its own services.

In sum, Defendants admit that they solicited on behalf of a "new company" (DSOF ¶ 19), used SBC contracts to secure accounts, and then temporarily performed the work using Flood, Inc., before SBC was fully operational. In light of these undisputed facts, the Court finds that Flood, Inc. acted as an alter ego for SBC, and

that it would be promote injustice to permit Defendants to avoid reporting the actual start date of operations on their CGL and Auto Applications by soliciting customers with one company and then temporarily invoicing them through another until the insurance policy was fully approved. Both the individual Defendants and Flood, Inc. engaged in SBC business. As a result, the Court finds the collection of statements on Defendants' policy application regarding the status and start date of operations to be false.

Finally, Grinnell argues that the omission of Flood, Inc. as an "other business venture" was a false statement on Defendants CGL and Auto Applications. (DSOF ¶ 30.) Both applications asked whether the applicant had other business ventures for which coverage was not being requested. Both times, Defendants answered in the negative.

Defendants argue that SBC and Flood, Inc. were separate entities, and thus they did not need to disclose Flood, Inc. on the insurance applications. As stated above, the Court finds the record replete with evidence that the two companies operated interchangeably depending on the needs of Defendants. However, this argument fails to address the actual text of the question. The application did not limit its request for information to only dependent or related companies but asked broadly whether there

were any other business ventures. The undisputed facts show that Flood, Inc. was a business venture owned by one of the applicants. The Court finds that it was a misrepresentation to omit Flood, Inc.'s existence from the insurance applications.

The undisputed facts show that the Cease-and-Desist Letter was a claim or an occurrence that may give rise to a claim that went unreported; Defendants engaged in business as an uninsured entity that went unreported; and Defendants failed to disclose a business venture. The Court now turns to whether any of these false statements were material.

### B. Materiality

A misrepresentation is material "if it affects either the acceptance of the risk or the hazard assumed by the company." *TIG Ins. Co. v. Reliable Rsch. Co.*, 334 F.3d 630, 635 (7th Cir. 2003). The court determines whether "reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application." *Id.* (quoting *Methodist Med. Ctr. v. American Med. Ctr. of Ill.*, 38 F.3d 316, 320 (7th Cir.1994)). Testimony from the underwriter may be used to establish materiality. *Id.*

Here, the underwriter has put forth an affidavit, explaining in detail why a cease and demand letter would increase the chances

of a lawsuit. Similarly, the underwriter has explained that operating uninsured businesses, as happened with SBC prior to the February 9, 2018, application and has been happening with Flood, Inc. since its creation, also would raise the estimated risk of ensuring the corporation and cause a rejection of an application.

In response, Defendants argue that the Cease-and-Desist Letter was over a dispute with the name "Flood" in "Flood, Inc.," and unrelated to the name of the new entity, "SBC Flood Waste Solutions." As discussed above, the Court finds SBC, Flood, Inc., and individual Defendants were operating as a single entity with a common interest. As a result, a reasonably careful person would regard the legal dispute with Brian, Shawn, and Chris Flood regarding the name "Flood" in "Flood, Inc." to materially increase the likelihood for SBC, owned and operated by individual Defendants Brian, Shawn, and Chris Flood, and Karen Conley, and including the word "Flood" in its name, to be sued.

Defendants' arguments regarding its early operations are also unpersuasive. Defendants focus on the date of the policy applications and their subsequent approval, February 9, 2018, and February 12, 2018, respectively, to argue that Defendants technically did not use SBC for the bulk of their operations prior to February 12th. However, the underwriter testified that operating without insurance created an unacceptably high-risk

profile. Regardless of whether it was a longtime operation, such as Flood, Inc., which has never operated with insurance, or SBC, which had hired at least one driver on February 5, 2018, four days prior to applying for insurance with Grinnell, the decision to operate without insurance is itself is associated with high risk. The Court accepts the underwriter's testimony that these are material omissions on which basis an insurance underwriter would not approve an insurance policy contract.

Because the undisputed material facts show Defendants provided false statements that materially affected the acceptance of risk assumed by Grinnell, the Court grants the Motion for Summary Judgment. Because the Court grants summary judgment in favor of Grinnell, the Court denies the Motion to Strike as moot.

## IV.  CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is granted. (Dkt. No. 119.)  Plaintiff's Motion to Strike is denied as moot. (Dkt. No. 159.)

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 3/14/2022